IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| LEE CUNNINGHAM, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Cause No.: 4:13-cv-00554 |
| ) | |
| PETERSON MANUFACTURING COMPANY, ) | |
| PLAN ADMINISTRATOR, ) | |
| ) | |
| Defendant ) | |
| ) | |
| Serve: Peterson Manufacturing Company ) | |
| 4200 East 135th Street ) | |
| Grandview, Missouri 64030 ) | |
| AGENT FOR SERVICE OF PROCESS ) | |
| ) | |
| and ) | |
| ) | |
| UNITED OF OMAHA LIFE INSURANCE ) | |
| COMPANY, ) | |
| ) | |
| Defendant. ) | |
| ) | |
| Serve: Director of Missouri Department of Insurance ) | |

## AMENDED COMPLAINT

**COMES NOW** Plaintiff, Lee Cunningham, by and through her undersigned attorney, and for her cause of action against Defendant Peterson Manufacturing Company Plan Administrator, and Defendant United of Omaha Life Insurance Company, states as follows:

### SUBJECT MATTER JURISDICTION

1. This case involves the denial of disability benefits provided through an employment plan subject to the Employee Retirement Income Security Act of 1974 (ERISA). Accordingly, this Court has subject matter jurisdiction. 29 U.S.C. 1132.

1

## PARTIES

2. Plaintiff, Lee Cunningham, is and at all times hereinstated was a participant in the Peterson Manufacturing Company Group Long-Term Disability Insurance Plan, Policy Number GLTD-98W5, and is bringing this action under 29 U.S.C. 1132 to recover benefits due to her under the terms of her plan, to enforce her rights under the terms of the plan, and to clarify her rights to future benefits under the terms of the plan. Accordingly, she has standing to bring this action as a party plaintiff. 29 U.S.C 1132 (a)(1)(B).

3. This case concerns the Peterson Manufacturing Company & Affiliates Long-Term Disability Benefits which may be hereinafter referred to as "the Plan."

4. The Plan is provided through and administered by its Plan Administrator and Agent for Service of Process, Peterson Manufacturing Company.

5. The Plan is fully insured by Defendant United of Omaha Life Insurance Company, and Peterson Manufacturing Company is the Policyholder.

6. The Plan is fully insured by Defendant United of Omaha Life Insurance Company, and Peterson Manufacturing Company as both Plan Administrator and Policyholder has delegated Defendant United of Omaha Life Insurance Company (hereinafter Defendant Omaha) full discretion to determine eligibility, construe and interpret all terms and provisions of the insurance policy; and with exclusive power to decide whether to pay benefits.

## PERSONAL JURISDICTION AND VENUE

7. Plaintiff resides in Harrisonville, Cass County, Missouri. The Plan Administrator administers the Plan at its place of business in Grandview, Jackson County, Missouri. Defendant Omaha conducts the business of insurance in the state of Missouri. This Court has jurisdiction of all parties, and venue is in the Western Division of the Western District of Missouri.

## CAUSE OF ACTION

8. At all times hereinstated, unless otherwise specified, Plaintiff was an employee of Peterson Manufacturing Company.

9. At all times hereinstated, in consideration of her employment and the terms, conditions, and agreements set out in the Plan, which is attached hereto and incorporated herein by reference as **EXHIBIT A**, Plaintiff was covered under a fully insured group long-term disability policy issued to her employer, Peterson Manufacturing Co., issued out of Missouri, and effective on October 1, 2004.

10. At all times hereinstated, the Plan was fully insured by Defendant Omaha.

11. Under the terms of the Plan, the Policyholder/Plan Administrator/Employer Peterson Manufacturing Co. delegated Defendant Omaha full discretion to determine eligibility, construe and interpret all terms and provisions of the insurance policy; and with exclusive power to decide whether to pay benefits.

12. On or about January 31, 2008, Plaintiff stopped work for Peterson Manufacturing Co because of pain in her hip and buttocks. Thereafter, she made a claim for disability under the Plan, and her claim was approved with benefits commencing May 1, 2008.

13. On or about April and May of 2011, Defendant Omaha undertook a review of Plaintiff's case and sought and obtained medical records and answers to questionnaires from her treating physicians.

14. On or about December 28, 2011, Defendant Omaha advised Plaintiff that based upon their review, they were "unable to approve benefits beyond December 21, 2011. . . ."

15. Defendants terminated Plaintiff's disability for the following stated reasons:

a. "The severity of your pain complaints and your lack of activity are not consistent with what is contained in medical records received and reviewed in this case. You are now well beyond a six month recovery period from your surgery date and there is no evidence of any neurological deficits to your lower extremities post operatively."

b. "The restrictions and limitations Dr. Travis outlined in the Physical Capacities Checklist completed on October 26, 2011, are very restrictive and indicate you are unable to meet your own personal activities of daily living, however, there is no inference in the records you require home assistance, other than with heavier activities such as housework, and yard work.

c. "All the medical documentation was reviewed by our Medical Consultant on December 15, 2011. The Medical Consultant opined the overall medical documentation lacks objective, physical and diagnostic findings of a sufficient degree to support restrictions and limitations that would preclude you from performing a sedentary occupation."

d. "We wrote to Dr. Travis on November 14, 2011 [sic], asking for clarification on the restrictions and limitations that are preventing you from performing a sedentary occupation. We provided him with our findings based on the information in your file and confirmed on December 16, 2011, the fax was received by his

4

office.  In the letter, we requested a response be provided within 10 business days, otherwise we would move forward with our determination based on the information in the file.  If he was in agreement, we asked him to sign, date and return our letter.  If he disagreed with our findings, we asked that he submit additional medical documentation to support his rationale.  Dr. Travis signed our letter on December 16, 2011, indicating he agreed with our determination you are able to perform the Material Duties of a sedentary occupation."

   e.   A copy of the termination letter is attached hereto as **EXHIBIT B**.

16.   Under date of March 5, 2012, Plaintiff appealed the termination of her benefits. Her appeal letter together with attachments is attached hereto and incorporated by reference as **EXHIBIT C**.

17.   Among the attachments to **EXHIBIT C** was a letter dated February 1, 2012, from Dr. Aaron L. Travis, D.O., directed to Mutual of Omaha.  As a part of his letter Dr. Travis wrote:

> "I received a letter from you dated December 16, 2011 that was 4 pages long and in review of this letter, I thought it was a request for her medical records.  I signed this form and returned it back to you.  Unfortunately my signature was attached to the 4th paragraph on the bottom of the letter stating that I agree with the fact that you feel that her limitations are not supported by the evidence.  I apologize for the signature that was placed on this letter because I do feel she is significantly debilitated due to her pain and see no significant change in her pain as well as her functional status over the last year."

18.   On or about February 8, 2011, Dr. Frank Feigenbaum, M.D., a neurosurgeon, performed an S-2, S-3 laminectomy, treatment of S-2, S-3 meningeal cysts of the sacral area, laminar reconstruction plating.  Among the attachments to **EXHIBIT C** was a treatment note

5

written by Dr. Feigenbaum under date of February 6, 2012. As a part of his treatment note Dr. Feigenbaum wrote:

> "We discussed at length her continued symptoms are most likely due to chronic nerve irritation from her cyst pressing on her nerves for a long period of time. The surgery was designed to get the pressure off the nerves, however it takes time for the nerves to recover if they can. While her symptoms have not continued to progress, she has not experienced much improvement since her surgery. This implies that there was more existing nerve damage at the time of her surgery."

19. Among the attachments to **EXHIBIT C** was a letter written by Dr. Feigenbaum under date of February 6, 2012, "To whom it May Concern." As a part of his letter, Dr. Feigenbaum wrote:

> "Lee Cunningham is a patient under my care. She was diagnosed with multiple Tarlov cysts. I specialize in the treatment of these rare meningeal cysts. She had a history of seven years of suffering with sacral pain radiating to the left buttock, hip, lateral calf, and across the top of her left foot prior to treatment. She also has leg and foot weakness and perineal and groin pain. Her symptoms are made worse by sitting and walking. She has to avoid sitting related activities due to the severity of the pain. She has to take narcotic medication to get through her day.
>
> "The cysts on her MRI were causing blatant compression of the sacral nerves and as such caused significant symptoms as described. The Tarlov cysts also caused significant bone erosion of the sacrum. I performed a surgery that took the pressure off of the nerves on February 8, 2011. She briefly experienced some minimal improvement after the surgery but it was not long lasting. While she admits she is not worse since the surgery she is not improving. Since the surgery her symptoms have not continued to escalate as they were prior to surgery. She has continued to follow up with me and has not had recurrence of her cysts however she remains very symptomatic. This implies there was damage to the nerves already existing from years of pressure on the nerves from multiple cysts for many years. She remains disabled and unable to participate in employment of any kind. She still cannot sit for more than 15 minutes without pain or walk distances without aggravating her symptoms. She has bladder dysfunction requiring medication. Slight increases in activity have a significant negative effect on her comfort level, and neurological function."

6

20. Under date of April 16, 2012, Defendant Omaha upheld its denial of Plaintiff's claim. A copy of its decision is attached as **EXHIBIT D**. After a recitation of the medical records and other documents which Defendant Omaha stated that it had reviewed, Defendant Omaha rejected the conclusions of Plaintiff's treating physicians, Drs. Travis and Feigenbaum, and affirmed the denial of Plaintiff's benefit for the following stated reasons:

    a. "An Internal Medical Consultant reviewed the medical information on April 13, 2012. The Medical Consultant stated that, despite your physicians' indication that your ongoing self-report pain is likely related to chronic nerve irritation from cysts pressing on the nerve roots for a long period of time, there have been no examination findings to indicate any evidence of muscle atrophy, significant lower extremity weakness, give way, the need for an ambulatory device or inability to drive yourself to appointments or sit during office visits. Examinations have noted full strength and motion without evidence of any focal neurological deficits, and there has been no electromyography or nerve conduction study to confirm ongoing nerve compression or compromise.

    b. "Overall, the Medical Consultant acknowledged that you would benefit from the ability to change positions as needed for comfort, and/or a modified workstation to include the option to sit or stand, Also, we understand that you continue to take narcotic pain medications to control your pain. However, there have been no mental status examinations or abnormalities documented in regard to your cognitive functioning, and you would be able to work while taking stable doses of these medications.

    c. "Despite your ongoing evaluation and treatment for chronic low back and left leg pain, there is no evidence of neurological or physical functional deficits to confirm a level of impairment to preclude you from performing the Material Duties of your Regular Occupation as a Corporate Accountant from December 22, 2011, and forward."

21. Defendant Omaha's decision of April 16, 2012, made no mention of its December 16, 2011, letter to Dr. Travis or to Dr. Travis's letter of February 1, 2012, above-mentioned, to Defendant Omaha.

22. Plaintiff then made a complaint to the Consumer Affairs Division of the Missouri Department of Insurance, Financial Institutions and Professional Registration. Defendant Omaha treated this complaint as Plaintiff's request for a second level appeal review, and, under date of October 8, 2012, issued its decision upholding its initial decision to deny benefits. A copy of Defendant's October 8, 2012, decision is attached as **EXHIBIT E**.

23. After a recitation of the medical records and other documents which Defendant Omaha stated that it had reviewed, under date of October 8, 2012, Defendant Omaha rejected the conclusions of Plaintiff's treating physicians Drs. Travis and Feigenbaum and affirmed the denial of Plaintiff's benefit for the following reasons:

> "Your medical records were reviewed by Dr. Jeffrey Dembner. His findings and conclusions are outlined below:
>
> 'The claimant has an ongoing pain syndrome with the demonstration of only mild lumbar degenerative disease and no neurological deficits. No medically directed limitation are thus supported for the period of December 22, 2011 to the present.'
>
> "Dr. Dembner indicated chronic low back pain and mild degenerative lumbar spine disease are supported by the medical records, however, there is insufficient evidence to correlate the pain syndrome with the radiographic findings.
>
> "Ms. Cunningham, a review of your medical records does not reveal evidence of an impairment precluding work beyond December 21, 2011. The exam findings have noted full strength with no evidence of focal neurological deficits, muscle atrophy or significant weakness. We acknowledge you may benefit from the ability to change positions as needed for comfort. However, there is no medical support for restrictions and limitations that would prevent you from performing the material dues of your sedentary occupation of Corporate Accountant, or from performing the material duties of another sedentary occupation."

24. Again, Defendant Omaha provided no reply to Dr. Travis's letter of February 1, 2012, aforementioned.

26. Dr. Frank Feigenbaum's operative report of February 8, 2011, contained the following observations:

    d. After Dr. Feigenbaum had opened and inspected within the left S4 nerve root Tarlov's cyst, he observed that "the elements of the left S3 nerve root fibers were quite splayed out over the inside of the cyst wall and did not appear to be in good shape."

    e. After Dr. Feigenbaum had collapsed and sewn shut a large left S4 nerve root Tarlov's cyst he "then tested the left S3 nerve root proximal area of cyst treatment and it still fired at low threshold."

    f. After Dr. Feigenbaum had collapsed and sewn shut a large left S2 nerve root Tarlov's cyst, he "then tested the left nerve root proximal area of cyst treat and it still fired at low threshold."

    g. After Dr. Feigenbaum treated a large right side S2 nerve root meningeal cyst/Tarlov's cyst, he "then tested the right S2 nerve root proximal area of cyst treatment and still fired at low threshold."

27. At no time did Defendant Omaha provide any documentation that either its internal medical consultant or Dr. Jeffrey Dembner had any specific response to Dr. Frank Feigenbaum's operative report of February 8, 2011, a copy of which is attached as **EXHIBIT F,** and his specific references to the appearance of the nerves upon visualization during surgery, and nerve testing.

28. Per **EXHIBIT E** Plaintiff has exhausted all administrative rights to appeal and satisfied all conditions precedent to bringing this suit.

29. The Plan is fully funded by insurance provided by Defendant Omaha.

30. The Plan Administrator as both Plan Administrator and Policyholder has delegated Defendant Omaha full discretion to determine eligibility, construe and interpret all terms and provisions of the insurance policy; and with exclusive power to decide whether to pay benefits.

31. Defendant Omaha has a "palpable conflict of interest" in that the insurer Defendant Omaha is both claims administrator and funder, is a for-profit entity and will profit merely through claims denials.

32. There was a substantial procedural irregularity in the claims processing in that Dr. Travis erroneously signed a form indicating that he agreed to Defendant Omaha's determination that Plaintiff was not disabled; in that Defendant Omaha immediately thereafter informed Plaintiff that her disability benefits were being terminated and expressly based its decision in part upon Dr. Travis' error; in that Dr. Travis immediately thereafter expressly informed Defendant Omaha that his signature was in error; in that Defendant Omaha never thereafter commented upon Dr. Travis' correction; reviewed it; or explained why Dr. Travis's apparent opinion that Plaintiff was not disabled carried weight but why his actual opinion that she was disabled carried insufficient weight even to require acknowledgement.

33. Plaintiff is entitled to "sliding scale" review. ***Morgan v. UNUM Life Ins. Co. of Am.***, 346 F.3d 1173, 1176 (8th Cir. 2003) (where a claims administrator failed to address adequately the medical evidence provided by the claimant's treating physicians).

34. The Plan's provisions required that "[i]f a claim is denied or partially denied, You will receive a written or electronic notice of the denial which will include:

    (a)    the specific reason(s) for the denial;

10

(b) reference to the specific Policy provisions on which the denial is based;

(c) if applicable, a description of any additional material or information necessary to complete the claim and the reason We need the material or information;

(d) a description of the appeal procedures:; including Your right to request an appeal within 180 days and Your right to bring a civil action following the appeal process; and

(e) any other information which may be required under state or federal laws and regulations."

35. Defendants denial of Plaintiff's claim was arbitrary and capricious, violated the Plan Provisions and otherwise deprived her of due process in one, some or all of the following respects:

    a. The physician who reviewed her medical records introduced irrelevant medical criteria into the analysis in that Defendants' consultant, Dr. Jeffrey Dembner, noted "only mild lumbar degenerative disease" which, he opined, was insufficient to cause debilitating pain; but Plaintiff's condition is the result of a disease process in Plaintiff's sacral spine, not her lumbar spine;

    b. Dr. Jeffrey Dembner introduced irrelevant medical criteria into the analysis in that he noted "no neurological deficits," the absence of which, he opined, impeached Plaintiff's expressions of pain; but Dr. Dembner begged the question of whether the existence of

11

neurological deficits is a necessary condition for the existence of pain and there exists no competent medical evidence in the record that supports a conclusion that a neurological deficit is a necessary condition for pain without which a physician may not, based on reasonable medical certainty, conclude a patient is suffering with pain.

c. Dr. Jeffrey Dembner ignored Dr. Feigenbaum's operative report (and apparently did not even look at it since Dr. Dembner indicated that he thought that Plaintiff's issue was with her lumbar spine) in that he noted "no neurological deficits" whereas Dr. Feigenbaum expressly noted that "elements of the left S3 nerve root fibers were quite slayed out over the inside of the cyst wall and did not appear to be in good shape," and in that following surgery the left S3 nerve root proximal area of cyst treatment still fired at a low threshold when tested, as did the left S2 nerve root proximal area of cyst treatment, and right S2 nerve root proximal area of cyst treatment—phenomena consistent with severe neuropathic pain secondary to nerve root damage.

d. Dr. Jeffrey Dembner concluded that Plaintiff had no neurological deficits without giving any consideration whatever to her treating physician's conclusion, based on his direct clinical observations of his patient, that she was suffering with leg and foot weakness.

12

e. Taking refuge in his irrelevant medical analysis of Plaintiff's lumbar spine, Dr. Jeffrey Dembner gave no consideration whatever to the relevant medical analysis by Plaintiff's neurosurgeon based upon his direct observation of nerve damage during surgery, upon nerve conduction testing during surgery and upon observations of his patient over the period of a year that because of years of meningeal cyst pressure in the sacral spine, Plaintiff had sustained nerve damage sufficient to cause debilitating pain.

f. Defendant Omaha's "internal medical consultant" rejected Plaintiff's neurosurgeon's conclusion that Plaintiff was suffering from nerve damage as a result of years of meningeal cyst pressure because "there [had] been no examination findings to indicate any evidence of muscle atrophy, significant lower extremity weakness, give way, the need for an ambulatory device or inability to drive yourself to appointments or sit during office visits"; because examinations had noted full strength and motion; and because there had been no electromyography or nerve conduction study to confirm ongoing nerve compression or compromise. But Defendant Omaha's "internal medical consultant" begged the question of whether nerve damage resulting from years of meningeal cyst pressure and causing debilitating pain necessarily also causes muscle atrophy, significant lower extremity weakness, give way, the need for an ambulatory device or inability to drive or

13

sit. And there exists no competent medical evidence in the record that supports a conclusion that a chronic nerve damage resulting from cyst pressure necessarily also causes muscle atrophy, significant lower extremity weakness, give way, the need for an ambulatory device and the inability to drive or sit.

g. Defendant Omaha's "internal medical consultant" rejected Plaintiff's neurosurgeon's conclusion that Plaintiff was suffering from nerve damage as a result of years of meningeal cyst pressure because there had been no electromyography or nerve conduction study to confirm ongoing nerve compression or compromise. But Defendant Omaha's "internal medical consultant" ignored without comment or competent medical review Dr. Feigenheim's direct visual observation of nerve damage and ignored without comment or competent medical review the neurological testing which he conducted during surgery which yielded results consistent with severe neuropathic pain.

h. Defendant Omaha's "internal medical consultant" rejected Plaintiff's expressions about her pain because the record contained no mental status examinations and Plaintiff had not documented abnormalities in her cognitive functioning. But Defendant Omaha's "internal medical consultant" begged the question of whether one who suffers with debilitating pain necessarily also will suffer from abnormalities in her cognitive functioning, and

there exists no competent medical evidence in the record that supports a conclusion that one who suffers from debilitating pain must also suffer from abnormalities in cognitive functioning.

i. Defendants introduced medical and vocational criteria and standards and placed a burden of production and proof upon Plaintiff which was arbitrary, capricious, and with no basis in the Plan or objective medical and vocational science in that they required her to produce radiological studies showing that she had severe degenerative changes in her lumbar spine; to produce nerve conduction tests or other neurological tests in addition to those noted in Dr. Feigenbaum's operative report showing that she had neurological deficits as well as evidence of muscle atrophy and weakness; and to produce mental status examinations showing that he had abnormalities in cognitive functioning.

j. Defendants arbitrarily and capriciously rejected the medical opinions of Plaintiff's medical treaters, substituting those of persons who had not seen, physically examined or performed diagnostic clinical tests on Plaintiff and who, accordingly, could not render competent medical diagnoses based upon knowledge and skills ordinarily exercised by medical professionals practicing medicine or psychology under the same or similar circumstances.

k. Defendants concluded that Plaintiff had not sustained her burden of production and proof in that she had not produced specific

15

medical documentation which Defendants identified, but the record contains no basis for concluding that sound medical practice required, or that competent medical doctors practicing medicine in the specialties practiced by Plaintiff's treating physicians, would ordinarily conduct the tests or create the records required by Defendants as a basis for their diagnoses and treatment; the record contains no basis for concluding that Plaintiff had not sustained her burden of proof; and Defendants' decision was arbitrary, capricious, and without any basis in the Plan, the record, or accepted medical practice.

l. Defendants concluded that Plaintiff had not sustained her burden of production and proof in that she failed to obtain expensive testing which her medical treatment did not require, which was not medically necessary, which would not likely be covered by health insurance, and whose only purpose was to address Defendants' questions. Defendants' decision was arbitrary, capricious, and with no basis in the Plan in that it imposed a duty upon her to procure and produce evidence to establish her right to disability benefits where the said evidence was unnecessary to the competent medical diagnosis and treatment of her medical condition, i.e, Defendants arbitrarily and capriciously required more medical evidence of a medical condition than medical science requires as it is ordinarily practiced by physicians in the relevant practice area

exercising that degree of skill and learning ordinarily exercised in that area.

 m. In violation of the Plan, Defendants failed to identify those specific Plan provisions on which the denied claim was based in that they did not identify the Plan provisions concerning the kind and quantum of proof required of Plaintiff.

 n. In violation of the Plan, Defendants arbitrarily and capriciously found that Plaintiff could perform the duties of a sedentary occupation as ordinarily performed in the national economy, i.e., on a five day, 8 hour per day basis, without undue absences for symptoms or treatment.

36. Defendant's Plan is governed by ERISA, a federal statute, and must be applied in compliance with ERISA consistent with Plaintiff's rights to due process, equal protection, and access to the courts, all as guaranteed by the United States Constitution.

**WHEREFORE**, for the foregoing reasons, Plaintiff prays Judgment as follows:

A) That Defendant's denial of benefits violated the terms of the Plan and its own required procedures, was unreasonable, arbitrary and capricious, and in these respects and otherwise violated Plaintiff's rights to due process in that it relied upon guidelines and standards with no showing of their medical or vocational acceptance in the relevant scientific community, of their reliability or competence, or of their relevance; or it misapplied those guidelines and standards; in that the Defendant ignored compelling medical evidence of a neurological basis for Plaintiff's pain; and in that the Plan documents did not provide Plaintiff with notice of what kind or quantum of proof was required;

17

B) That on the record before Defendant and properly applying medically and vocationally competent and reliable standards, Defendant could not reasonably find that Plaintiff was not disabled under the terms and conditions of the Plan;

C) Entering Judgment that as of the date of Defendant's final denial Plaintiff was disabled pursuant to the terms of the Plan; or, alternatively, ordering that Defendant shall conduct a de novo review of Plaintiff's claim employing and applying the medical and vocational diagnostic and treatment guidelines and standards of those professionals who regularly actually treat and advise patients with that degree of skill and learning ordinarily exercised by specialists under the same or similar circumstances as presented by Plaintiff's case;

D) That Defendant shall pay costs and Plaintiff's attorney fees; and

E) For such other and further relief as the Court deems just.

**CARSON & COIL, P.C.**

By: /s/ Paul Graham
Paul Graham, Mo Bar No. 30416
515 E. High Street, P.O. Box 28
Jefferson City, Missouri 65102
Telephone: (573) 636-2177
Facsimile: (573) 636-7119
Paul.g@carsoncoil.com
**ATTORNEYS FOR PLAINTIFF**